**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**CHRISTOPHER J. ACCORSINI,**

      **Plaintiff,**

**vs.**                                  **Case No. 4:09cv221-SPM/WCS**

**MICHAEL J. ASTRUE,
Commissioner of Social Security,**

      **Defendant.**

_____/

**REPORT AND RECOMMENDATION**

This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D. Loc. R. 72.2(D). It is recommended that the decision of the Commissioner be reversed and remanded.

**Procedural status of the case**

Plaintiff, Christopher J. Accorsini, applied for disability insurance benefits and supplemental security income benefits. His last date of insured status for disability benefits was December 31, 2009. Plaintiff alleges disability due to mental retardation, organic mental disorder, and learning disabilities, with onset since childhood.

There were two administrative hearings. The first occurred on October 18, 2006. R. 302-329. The second occurred after remand from the Appeals Council on November 16, 2007. R. 330-364. Plaintiff was 32 years old at the time of the second administrative hearing, completed the 12th grade in special education, and has no past relevant work. R. 337-339, 28.

The Administrative Law Judge found that Plaintiff has no physical limitations, and can perform a full range of heavy work. R. 27. She further found that Plaintiff "is limited to simple, routine, repetitive work not involving detailed, complex instructions and with only minimal reliance on reading and writing skills due to his mental limitations." *Id.* At another point, she determined that Plaintiff "is capable of performing simple, routine tasks with single step directions." R. 26. Relying upon testimony from a vocational expert, the ALJ determined that, within these limitations, Plaintiff could do work as a dishwasher and kitchen helper, as a counter attendant, and as a cleaner of vehicles or equipment. R. 31. Thus, she determined that Plaintiff was not disabled. R. 32.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles. Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005). "The Commissioner's factual findings are conclusive if

supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002).  "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted).  The court must give "substantial deference to the Commissioner's decision."  Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."  Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' "  Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12

months . . . ." 42 U.S.C. § 423(d)(1)(A). Both the "impairment" and the "inability" must be expected to last not less than 12 months. Barnhart v. Walton, 535 U.S. 212, 122 S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

The Commissioner analyzes a claim in five steps. 20 C.F.R. § 404.1520(a)-(f):

1.  Is the individual currently engaged in substantial gainful activity?

2.  Does the individual have any severe impairments?

3.  Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.  Does the individual have any impairments which prevent past relevant work?

5.  Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits. A positive finding at step three results in approval of the application for benefits. At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work. If the claimant carries this burden, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy. Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Evidence from the administrative hearing**

Plaintiff testified at the first hearing that he drove a truck and did custodial and yard work in his father's plumbing and heating business. R. 309-310. He had earnings from his father's business from 1991 to 2004. R. 311. Plaintiff said that he was supervised by his father, and he was assigned only one task at a time. R. 314. His father provided written instructions about how to do each job. R. 320. After giving the instructions, his father would go about his own work. R. 321. Plaintiff said that he had difficulties performing the job. R. 314. He said that the job ended when he moved to Florida with his fiance. R. 310-311. Plaintiff is now married. R. 307, 336.

Plaintiff said that he needs reminders to perform activities of daily living. R. 315. He said that he is unable to shop for groceries or make change. *Id.* and R. 323. He said he could not follow cooking instructions, but he could prepare simple meals, such as sandwiches. R. 315-316. He said he could not read and understand a newspaper article. *Id.* He said he loses interest in a television program lasting an hour. *Id.* He said that he does errands, but once a month he has problems failing to do what he is supposed to do. R. 317. He said that he gets frustrated easily, "shuts down," and does not want to do anything. R. 318. He said that he can use a computer for the internet and emails. R. 321. Plaintiff said he does household chores. R. 319. He cleans the kitchen, takes out the garbage, can drive a motor vehicle, runs errands, and likes to fish and play golf. *Id.*

Plaintiff said he has not looked for work since he moved to Florida. R. 313-314. He has not been involved in any job placement training programs. R. 318.

At the second administrative hearing, Plaintiff testified that he also worked as a custodian for United Cerebral Palsy for almost a year.  R. 340-341.  He had a supervisor who gave instructions to him, and he worked from 9 a.m. to 2 p.m.  R. 344.

Plaintiff said that he and his fiance came to Florida in 2004.  R. 343.  He repeated that he performs household chores, such as cleaning, cooking, and making beds.  R. 347-348.  He said that he has to be told what to do each day.  R. 347.  Plaintiff said the he could read very simple things like a basic recipe.  R. 362.  Plaintiff said he walks to mass daily.  R. 348, 350.  He said he could shop for groceries using a list, cannot understand change, but can use a debit card for the purchase.  R. 348.  When he worked for his father, Plaintiff was making $30,000 or more a year.  R. 350.

The vocational expert was asked to assume a person who is 32 years of age, with a special education high school diploma, and with no past relevant work.  R. 356.  The expert was asked to assumed that the person has a minimal vocational background, and is limited to "simple, repetitive work tasks, and would be unable to perform jobs requiring complex detailed instructions, and should also be in a position which does not require more than minimal reliance on reading and writing skills."  R. 356.  The expert said that such a person could do work as a dishwasher or kitchen helper, counter attendant, and cleaner of vehicles and equipment.  R. 356-357.  The vocational expert said that these jobs usually required repetitive tasks.  R. 358.  Such a person would have to be able to receive instructions at the beginning of the day and then follow through without further instruction.  *Id.*  He said that these jobs were low stress jobs.  R. 358-360.

The vocational expert relied solely upon the description of these jobs in the

DICTIONARY OF OCCUPATIONAL TITLES (DOT). R. 357. The vocational expert did not

testify that he relied upon any job information that he had collected other than from the

DOT. R. 353-361. The ALJ did not ask the vocational expert whether the there was any

conflict in his testimony between the hypothetical and the job descriptions in the DOT,

and the vocational expert did not mention any inconsistencies. R. 353-361.

**Medical evidence**

On June 4, 1984, at age 9, Plaintiff was referred to Herbert Kaye, Ph.D., "for

evaluation because of a wide-ranging set of learning and attention problems." R. 201.

Dr. Kaye noted that Plaintiff had had a severe fall before he was two years of age,

damaging his forehead. *Id.* After testing, Dr. Kaye concluded that Plaintiff did not

"show a pattern which would be expected to respond in any simple way to stimulant

medication." R. 203. Dr. Kaye found that Plaintiff had "many abnormalities in his pre-

medication response to auditory and visual information." *Id.* The pre-medication

results, said Dr. Kaye, were "expected to impair [Plaintiff's] ability to associate visual

and verbal stimuli. Would likely impact on short-term visual memory and affect his

ability to place information he is receiving into a meaningful context." *Id.* It was also

thought that his "pre-medication auditory problems would be expected to impair basic

comprehension, and would show up as some degree of receptive inadequacies." R.

204. It was thought that some of Plaintiff's attention problems were secondary to his

information processing problems. *Id.*

On October 17, 1986, Plaintiff was evaluated by Anita Belman, M.D.  R. 252-254.
Her impression was that Plaintiff had attention deficit disorder, a probable learning
disability, was immature, and had poor self esteem secondary to his disabilities.  R. 254.

From October 28, 1987, through November 2, 1987, Plaintiff had a
neuropsychological evaluation by J. Wayne Lazar, Ph.D. on referral by Dr. Belman.  R.
205-209.  He was then 12 and 1/2 years old.  R. 208.  A CT scan by Dr. Belman had
been normal.  R. 205.  From Dr. Belman's report, Dr. Lazar noted "significant findings"
that Plaintiff had no hand preference and had "developmental lags in visual perceptual
and motor areas."  *Id.*  Dr. Lazar said that a school psychologist, W. Judd, had
performed a WISC-R intelligence test.  *Id.*  Plaintiff scored a  Full Scale IQ of 69, a
Verbal IQ of 79, and a Performance IQ of 63.  *Id.*  His spelling and arithmetic were then
at the second grade level, while his reading was at the primer level.  *Id.*  By testing,
These impaired levels were confirmed to be persisting.  R. 208.  Dr. Lazar said that
Plaintiff was in the borderline range of functioning.  R. 206.  He thought that Plaintiff had
common sense and managed pictorial information adequately, but had difficulties with
conceptual linguistic demands.  *Id.*  Plaintiff's auditory perceptual skills were generally
weak.  *Id.*  Plaintiff was able to follow moderately complex directions, but had difficulty
with expressive language and use of grammar.  R. 206-207.  Plaintiff had difficulties
with attention, memory functions, visual functioning, perceptual functioning, and
constructional functioning.  R. 207.  Dr. Lazar concluded that Plaintiff had attention
deficit hyperactivity disorder "and should be continued to be considered as severely
learning disabled."  R. 209.  Scores from another IQ test follow, carrying the next

sequential page numbers, indicating that they were a part of his report.  R. 210.  On a

WISC-R, Plaintiff had a Full Scale IQ of 72, a Performance IQ of 72, and a Verbal IQ of

75.  *Id.*

In early August, 1988, Plaintiff was evaluated by Mark D. Rapport, Ph.D.  R. 213.

He was then 13 years old.  *Id.*  Dr. Rapport said that Plaintiff appeared to be functioning

in the borderline range of intelligence at the 1.7 to 2.3 grade equivalent in achievement,

six years below his chronological age.  *Id.*  Dr. Rapport said that Plaintiff's ability to

sustain attention to task was severely impaired and worsened as task difficulty

increased.  *Id.*  He said that Plaintiff's ability to remember over a 15 minute span was

also severely impaired, and that Plaintiff forgot 1.6 out of 1.9 associations over that

period.  *Id.*  Dr. Rapport's diagnoses were attention deficit disorder with hyperactivity,

borderline intellectual functioning, specific learning disability, and probable expressive

and receptive language delay.  *Id.*  He recommended a trial of medication to treat

Plaintiff's impulsivity and inattention.  R. 214.  It was thought that Plaintiff's learning

ability would improve only in those areas, and that he needed a closed classroom with

one teacher.  *Id.*

On March 30, 1995, when Plaintiff was almost 20 years old, it was noted on an

individualized education program report that in September, 1993,  in another IQ test,

Plaintiff had tested 72 Full Scale, 64 Performance, and 81 Verbal.  R. 199.  He was then

in a self-contained classroom and was to receive an IEP diploma.  *Id.*

On March 8, 2005, Plaintiff was evaluated on a consultative basis by Ellen E.

Resch, Ph.D.  R. 255-257.  Plaintiff told Dr. Resch that he received social security

benefits when he was 17 years old, but those benefits ended in 1999 when he went to work for his father. R. 255. He said that he wanted to restart the benefits because he was unemployed. *Id*. Plaintiff said that there was nothing physically or mentally making him unable to work. *Id*. He said he worked with his father from 1999 to 2004. *Id*. He said that he used a pickup truck to make deliveries in his father's business in a hundred-mile area, and was "very good at it." *Id*. He said that he was placed into special education due to reading problems, but now has reading glasses and reads "all the time." *Id*.

Dr. Resch reported from her mental examination that Plaintiff was oriented, was congenial, friendly, had good eye contact, and could hold a conversation. R. 256. She found him to be cooperative, focused, and motivated. *Id*. She found that he accepted failures during testing and was able to recover. *Id*. She found Plaintiff's communication to be coherent, understandable, clear, lacking in detail, but responsive to questions. *Id*. She found Plaintiff's thought process to be organized. *Id*. She found that Plaintiff was "aware of the current president, the governor of Florida, the price of houses in his neighborhood, and could give abstract meanings for simple sayings." *Id*. She found that Plaintiff's preferred reading materials (Harry Potter books, THE LION, WITCH, AND THE WARDROBE, and HOLES) were suggestive of social immaturity and a preference for fantasy. *Id*.

Dr. Resch administered the Wechsler Adult Intelligence Scale-III test, finding Plaintiff to be cooperative, motivated, and attentive, and she found her results to be valid. R. 256. Plaintiff's scores were: Verbal IQ of 75; Performance IQ of 72; and Full

Scale IQ of 71. She commented that the scores were overall in the "borderline" range.

*Id.* She found that Plaintiff had relative weakness in mental mathematical problem

solving, and relative strength in social comprehension. *Id.*

Dr. Resch said that Plaintiff reported to her that he stays home taking care of the

house while his wife works. R. 257. He said that he vacuums, washes clothes, makes

the bed, attends church on Sunday, and although his wife pays the bills, he mails the

payments. *Id.* Plaintiff told Dr. Resch that he could make purchases for himself and get

correct change, and that his ability to complete tasks was good. *Id.* Dr. Resch

concluded:

> In my opinion, this claimant is capable of understanding, remembering,
> and carrying out short, simple instructions. His level of intellectual
> functioning, in the borderline range, would make it difficult for him to fully
> understand and carry out more complex instructions. There is no
> apparent difficulty with attention, concentration, or persistence. He is
> capable of learning. His social skills are adequate for everyday
> interchanges. He is able to drive and find new locations. He appears able
> to cope with changes such as moving to a new state and meeting new
> people.

R. 257. She thought that with continued social support, Plaintiff's prognosis was fair,

but that Plaintiff would have difficulty managing his finances due to weakness in

arithmetic. *Id.* Dr. Resch concluded with the recommendation that "the observations

and conclusions be supplemented by collateral data such as objective third party

information and school records." *Id.*

On April 4, 2005, Eric Martin, Ph.D., reviewed the records without examining

Plaintiff and determined that Plaintiff "appears capable of adequate adaption & of

routine, repetitive tasks."  R. 260.  Dr. Martin said that Plaintiff "may have difficulty with

detailed instructions," but "appears capable of adequate task persistence overall."  *Id.*

On June 8, 2005, a second non-examining psychologist, T. Wayne Conger,

Ph.D., also reviewed the records and determined that Plaintiff had borderline intellectual

functioning based upon the most recent IQ scores by Dr. Resch.  R. 263.  Dr. Conger

thought that Plaintiff had moderate limitations in maintaining concentration, persistence,

and pace, but only mild or nonexistent limitations in other areas.  R. 272.  Dr. Conger

determined that Plaintiff had been "gainfully employed for a number of years," had

reapplied for social security benefits, but acknowledged he had no mental or physical

impairment, and testing showed borderline intellectual abilities.  R. 274.  He concluded

that Plaintiff's condition did not meet or equal any listed impairment.  *Id.*

There are also three letters in this record, one from Plaintiff's father, Francis J.

Accorsini, one from Robert Ruggiero, Mr. Accorsini's business partner, and one from

Plaintiff's wife.  R. 279-281, 300.  Mr. Accorsini states that while his son has learned to

present himself "well as far as his oral skills and personality are concerned and appears

to most people that meet him, as a normal functioning individual," "[w]hen you delve

below the surface you see, very early, that his math skills, logic, reading, writing, and

ability to concentrate on multiple tasks are severely hampered."  R. 279.  Mr. Accorsini

further states that Plaintiff tried several jobs but did not do well, and he and his partner

decided to create a job for Plaintiff in their company.  R. 279-280.  Plaintiff was given

the job of shop hand and assistant truck driver.  R. 280.  Plaintiff did maintenance, ran

errands, and delivered items to job sites.  *Id.*  He said, however, that he and his partner

tolerated Plaintiff's performance difficulties and inadequacies, and would not have done

so had not Plaintiff been his son. *Id.* He said: "We would not have accepted this

performance from an unrelated individual and we certainly would not have created a

place for him to work." *Id.* To illustrate his point that Plaintiff had learned to present

himself superficially as unimpaired, Mr. Accorsini noted that when the ALJ asked how

he performed his work for his father, "he indicated that he did it very well." *Id.*

Mr. Ruggiero corroborated this evidence. R. 281. Mr. Ruggiero was Mr.

Accorsini's partner in ARA Plumbing & Heating Corporation, a mechanical contracting

company. *Id.* Mr. Ruggiero said that they created a job for Plaintiff that would allow him

to work in a familiar surroundings with people who knew him and understood his

situation. *Id.* He said:

> Christopher was given simple tasks under direct supervision. The tasks
> were simple and repetitive. He was able to handle this work as long as he
> was supervised and someone was with him to correct his mistakes. As
> time moved on, we tried to give Chris more challenging tasks with less
> supervision. Chris would grow frustrated when he was told he made a
> mistake. He would then lose his focus and become confused.

*Id.* Mr. Ruggiero said that the people who worked in the company were aware of

Plaintiff's disability, and were "very caring and patient with him." *Id.*

> They tried to teach him how to become more productive, [but]
> unfortunately Chris could not retain the lessons that were taught. As I
> stated previously, he would lose focus and become frustrated. This would
> disturb Chris more than he let on. One of Chris's greatest pleasures was
> to be told he did a good job.

*Id.*

Plaintiff's wife, Caroline Ulrich Accorsini, states in her letter that Plaintiff had

become extremely anxious in the two weeks leading to the administrative hearing. R.

300. She said he "started 'shutting down,' which in his case means that he is not

completing daily tasks without constant reminders of what needs to be done, is more

prone to argue, and is less sociable at night when everyone is home from work."  *Id.*

She said that Plaintiff's "anxiety and shutting down occurs at every major event in his

life."  *Id.*  Ms. Accorsini states:

> Christopher, at this time, functions at the most basic level.  He does not
> fully understand the process, even though he states that he does.  He
> does not fully understand everything told to him and tends to tell people
> exactly what he thinks they want to hear and not necessarily the truth or
> the information they need.

*Id.*

## Legal analysis

### Whether the ALJ erroneously found that Plaintiff could do other work

The ALJ found that Plaintiff is limited to "simple, routine, repetitive work not

involving detailed, complex instructions and with only minimal reliance on reading and

writing skills due to his mental limitations."  R. 27.  She also found that Plaintiff "is

capable of performing simple, routine tasks *with single step directions*."  R. 26

(emphasis added).  The ALJ used the first of these limitations in his hypothetical to the

vocational expert.  R. 356.  The vocational expert identified three jobs which Plaintiff

may do, assuming these functional limitations.  R. 356-357.

Plaintiff contends that if the ALJ's residual functional capacity assessment is

correct, Plaintiff cannot do the three jobs identified by the vocational expert and that the

vocational expert's testimony conflicts with the DOT.  Plaintiff points out that according

to the DOT, all three jobs have reasoning ("R") levels of 2.  Doc. 15, p. 10.  Reasoning

level 2 requires that a person be able to "apply commonsense understanding to carry

out *detailed but uninvolved* written or oral instructions," and "deal with problems

involving a few concrete variables in or from standardized situations."[1]  *Id.* (emphasis

added).  Reasoning level 1 requires that a claimant be about to "apply commonsense

understanding to carry out simple one- or two-step instructions," and to "deal with

standardized situations with occasional or no variables in or from these situations

encountered on the job."  *Id.*  Plaintiff argues that where there is a conflict between the

vocational expert's opinion and the job description in the DOT, Social Security Ruling

00-4p requires that the vocational expert identify that conflict, and the ALJ must inquire

whether the opinion is consistent with the DOT.[2]

      Defendant asserts that there was no conflict.  Defendant argues that although the

jobs identified require reasoning level 2, the word "detailed" in the job description is not

relevant since "uninvolved" instructions are all that are needed to do the job, even

---

[1] DICTIONARY OF OCCUPATIONAL TITLES , Appendix C, Components of the Definition
Trailer, found at http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM.

[2] Social Security Ruling 00-4p is found at:
http://www.ssa.gov/OP_Home/rulings/di/02/SSR2000-04-di-02.html.  It provides in part:

> When a VE or VS provides evidence about the requirements of a job or
> occupation, the adjudicator has an affirmative responsibility to ask about
> any possible conflict between that VE or VS evidence and information
> provided in the DOT. In these situations, the adjudicator will:
>
> > * Ask the VE or VS if the evidence he or she has provided
> > conflicts with information provided in the DOT; and
> >
> > * If the VE's or VS's evidence appears to conflict with the
> > DOT, the adjudicator will obtain a reasonable explanation for
> > the apparent conflict.

though such instructions may be "detailed."  Doc. 19, p. 27.  Defendant asserts that the jobs require "simple and routine work," well within Plaintiff's mental residual functional capacity.  *Id.*  Defendant cites <u>Abrew v. Astrue</u>, 2008 WL 5268550, *2, 303 Fed.Appx. 567, 569-570 (9th Cir. Dec 17, 2008) (not selected for publication in the Federal Reporter, No. 07-35243), which held without discussion that a finding that the claimant could do only "simple tasks" is not in conflict with a finding that he could do work at reasoning level 2, carrying out "detailed but uninvolved written or oral instructions."

This is not persuasive.  The word "detailed" means more than the word "uninvolved."  The word "uninvolved" is confusing at best.  A detailed uninvolved instruction is probably not a detailed complex instruction, but a "detailed" instruction of any kind can hardly be said to be within the capability of someone who can only do "simple, routine, repetitive" work and is limited to "single step directions," as found by the ALJ.  There is a lot of evidence in this case that Plaintiff cannot remember detailed instructions.  The mental residual functional capacity determination by the ALJ in this case is more like reasoning level 1.

Further, the definition says nothing about the frequency of instructional changes.  Work that has *changing* detailed uninvolved instructions can hardly be described as "simple, routine, repetitive" work within the mental residual functional capacity determined by the ALJ.  Indeed, if the detailed "uninvolved" instructions change daily, the need to understand the new instructions daily would make the instructional process complex.

In sum, the vocational expert's testimony conflicts with the DOT description of the jobs identified by the vocational expert, and is inconsistent with the residual functional capacity assigned in the hypothetical. *See*, <u>Akins v. Commissioner of Social Sec.</u>, 2009 WL 2913538, __ F.Supp.2d __ (M.D. Fla. Sep 10, 2009) (No. 608-CV-1575-ORL-DAB):

> While not entirely clear, it does appear that the DOT descriptions are not consistent with opinion of the VE that a claimant limited to simple repetitive tasks could perform work at reasoning level 2 and 3. At the very least, the record does not indicate any explanation as to how the hypothetical claimant limited to only simple repetitive tasks could perform any of these occupations, as described by the DOT.

2009 WL 2913538, *5.

This inconsistency, however, does not end the analysis. In 1999, the Eleventh Circuit held that "when the VE's testimony conflicts with the DOT, the VE's testimony 'trumps' the DOT." <u>Jones v. Apfel</u>, 190 F.3d 1224, 1229-1230 (11th Cir. 1999), *cert. denied*, 529 U.S. 1089 (2000). <u>Jones</u> noted that other circuits were in disarray on this issue, and it found most persuasive a decision from the Sixth Circuit. *Id.*, at 1229. The court noted that the DOT was not the sole source of admissible information about jobs, and "itself states that it is not comprehensive." *Id.*, at 1230. The court also observed that the vocational expert supplemented the DOT information with local information:

> In this case, the VE testified that he compiled the employment information from a personal survey, contact with employers and other VEs and a survey of literature such as census reports and county business patterns.

*Id.*

Social Security Ruling 00-4p was promulgated after <u>Jones</u> was decided. Subsequently, and specifically referring to SSR 00-4p, the Eleventh Circuit reasoned in an unpublished decision that agency rulings do not bind the court. <u>Miller v.</u>

Commissioner of Social Sec., 2007 WL 2461771, *2, 246 Fed.Appx. 660, 661-662 (11th

Cir. Aug 31, 2007) (not selected for publication in the Federal Reporter, No. 07-11364).

The court further said:

> Even assuming that an inconsistency existed between the testimony of the
> vocational expert and the DOT, the ALJ did not err when, without first
> resolving the alleged conflict, he relied on the testimony of the vocational
> expert. Our precedent establishes that the testimony of a vocational
> expert "trumps" an inconsistent provision of the DOT in this Circuit.

*Id.* (citing Jones).

Following Miller, the Middle District of Florida has held that "[t]he promulgation of

SSR 00-4p does not . . . undo the rule in *Jones* nor does the ruling by its own wording,

mandate that an ALJ has a duty independently to investigate whether there is a conflict

between the VE's testimony and the DOT." Sollars-D'Annunzio v. Astrue, 2009 WL

302170, *10 , __ F.Supp.2d __ (M.D. Fla. Feb 06, 2009) (No. 5:08-CV-80-OC-GRJ). In

that case, however, the court first found that the ALJ *had* inquired of the vocational

expert as to whether there were any conflicts with the DOT and received a negative

response. *Id.*, at *9. Thus, the court found that the ALJ complied with SSR 00-4p. *Id.*

Consequently, the question of whether the ALJ had an independent duty to investigate

as to whether there was a conflict was theoretically no longer before the court and the

statement that the ALJ had no independent duty to ask whether there was a conflict was

*dicta.* Akins, another Middle District of Florida decision, on the other hand, held that:

> Thus, it appears to be the current state of the law in this Circuit that *the
> ALJ must inquire as to whether the VE's testimony is consistent with the
> DOT* but, if it is not, an ALJ may rely upon the testimony of the VE without
> first resolving any conflict.

2009 WL 2913538, *6 (emphasis added).  <u>Akins</u> acknowledged the unpublished <u>Miller</u>

decision, but found it distinguishable for the following reasons:

> This Court acknowledges the holding in *Miller*, an unpublished decision,
> but does not find that it controls the result here.  In this case, the ALJ
> made an affirmative finding that the VE's testimony "was consistent with
> the information contained in the Dictionary of Occupational Titles" (R. 24).
> Thus, this is not a case where the VE testified that his opinion conflicted
> with the DOT and the ALJ, for whatever reason, did not resolve the conflict
> and instead adopted the VE's testimony.  Rather, the VE testified that his
> testimony was believed to be consistent with the DOT; a belief that was
> misplaced.  *The ALJ did not resolve the conflict, because he was not
> aware that any conflict existed.*  While the law allows for an ALJ to choose
> to rely on testimony that conflicts with the DOT, the record here indicates
> that the ALJ, at all times, believed that the VE testimony reflected the
> information contained in the DOT.  Thus, the ALJ did not make a choice in
> finding that the testimony was consistent with the DOT; he was
> misinformed.  *Miller* does not apply.

*Id.*

In short, the law is muddled and would greatly benefit from a published opinion

from the Eleventh Circuit.  In the case at bar, the ALJ never explored the inconsistency

between the DOT description of the job and the vocational expert's fitting of the job to

the hypothetical.  In <u>Akins</u> the ALJ did comply and got an incorrect negative answer.  In

<u>Akins</u> and the case at bar, there appears to be a conflict between the description of the

jobs in the DOT and the fitting of the jobs by the vocational expert to the hypothetical.

Given the uncertain state of the law, it is best to return to basics.  It is this court's

duty is to uphold the ALJ's decision if it is supported by substantial evidence in the

record.  Substantial evidence has a well-established legal definition described above.

The court in <u>Jones</u> found substantial evidence in the record to support the vocational

expert's opinion because the expert had conducted an independent analysis of jobs as

they existed in the local market, even though it conflicted with the DOT. Jones did not

categorically say that a vocational expert's opinion is substantial evidence, standing

alone, where it is based upon the job descriptions in the DOT, conflicts with the DOT,

and there is no other substantial evidence in the record to support the choice made by

the ALJ.

Likewise, the vocational expert in Miller relied upon the DOT description of the

job as the basis for his opinion. That DOT job description apparently did not fit the

residual functional capacity determined of the ALJ, and there was a conflict. The ALJ

did not explore this, and indeed, never knew that there was a conflict. An *unexamined*

and *unexplained erroneous* expert opinion simply cannot be substantial evidence in the

record to sustain the Commissioner's decision, and Jones did not go that far.

In the case at bar, while SSR 00-4p is not binding upon this court, it establishes a

sensible procedure to resolve the problem. It is recommended, therefore, that the case

be remanded for additional testimony from a vocational expert. The expert and the ALJ

should determine, as to any job identified by the expert, whether there is a conflict

between the job functions as described in the DOT and Plaintiff's residual functional

capacity. If there is a conflict, the ALJ should explore whether there is other evidence

upon which the expert's opinion might be based.

### Whether the ALJ failed to give proper weight to lay evidence and Plaintiff's testimony

Plaintiff contends that while the ALJ relied upon lay evidence from Plaintiff's

father, Mr. Accorsini, and his partner, Mr. Ruggiero, to determine that Plaintiff had no

past relevant work with their firm because it was sheltered work, the ALJ erred in failing

to give the same weight to this lay evidence (and the letter from Plaintiff's wife) in determining Plaintiff's residual functional capacity. Doc. 15, p. 12. Plaintiff also argues that the ALJ erred in failing to implement Dr. Resch's suggestion that her opinion be supplemented by collateral data such as objective third party information and school records. *Id.* Finally, Plaintiff argues that the ALJ should have considered that Dr. Resch herself did not receive any background information from the Commissioner prior to her evaluation.

The ALJ said that he gave considerable weight to the opinion of Dr. Resch, and less weight to the opinions of Mr. Accorsini, Mr. Ruggiero, and Ms. Accorsini "noting that they are lay persons." R. 29. The ALJ credited the lay opinions of Mr. Accorsini and Mr. Ruggiero when she found that Plaintiff "was hired despite his mental impairment because of his familial relationship," and that this work "did not constitute substantial gainful activity." R. 25, 30. It is recognized that the ALJ reached this conclusion by "giving the claimant every benefit of doubt,"[3] R. 29, but if the lay opinions were sufficiently reliable to determine that the work Plaintiff did for his father's business did not constitute substantial gainful activity (a determination that necessarily considered the demands placed upon Plaintiff in that work), the same lay opinions should have been equally credible as to Plaintiff's limitations (the reason that Mr. Accorsini and Mr. Ruggiero could not demand substantial gainful activity from Plaintiff when he worked for

---

[3] The ALJ seemed implicitly skeptical that the work was not substantial gainful activity because Plaintiff earned "up to $39,000 per year" in the job. R. 30. I see no reason for skepticism. If Plaintiff was given a sheltered job because he was the son of a partner, then the pay assigned to the job more likely was a way for Plaintiff's father to provide support to Plaintiff rather than to assign a market value for the work that he did.

them). Under these circumstances, the mere fact that these were the opinions of lay

persons is not substantial evidence to disregard them. The prior work was either

sheltered or it was not. If it was sheltered, it was probably because Plaintiff has the

limitations set forth in the lay opinions.

Further, the opinion of Dr. Resch is incomplete. She specifically recommended

that her "observations and conclusions be supplemented by collateral data such as

objective third party information and school records." R. 257. She did not see these lay

opinions, and had no opportunity modify her own opinion in light of such important

supplemental evidence. She did not have the earlier of evaluations, either, when

Plaintiff was of school age. The earlier evaluations cannot be discounted simply

because they are "old" since intelligence impairments of this sort manifest themselves in

childhood and are expected to last a lifetime.[4]

A remand is needed, therefore, so that the ALJ can squarely decide whether the

lay evidence from Mr. Accorsini, Mr. Ruggiero, and Plaintiff's wife, is credible or not, and

to supply that evidence to Dr. Resch so that she can determine whether it causes her to

modify her opinion. Dr. Resch is probably in a better position to determine whether the

lay evidence fits with her testing results and observations of Plaintiff. A remand is also

needed to supply Dr. Resch with the earlier evaluations of Plaintiff that are in this

record. If Dr. Resch is no longer available to perform this supplemental evaluation, then

---

[4] In Hodges v. Barnhart, 276 F.3d 1265 (11th Cir. 2001), the court held that "absent evidence of sudden trauma that can cause retardation, the IQ tests create a rebuttable presumption of a fairly constant IQ throughout her life." 276 F.3d at 1268.

another psychologist is needed to evaluate Plaintiff in light of the lay opinion and the earlier evaluations.

Plaintiff also argues that the ALJ failed to properly evaluate the credibility of his own testimony. Doc. 15, p. 14. Plaintiff contends that the ALJ did not explain why she found Plaintiff to be only partially credible. The reasons articulated for disregarding the claimant's subjective testimony must be based upon substantial evidence. Jones v. Department of Health and Human Services, 941 F.2d 1529, 1532 (11th Cir. 1991). Defendant argues now that Plaintiff's testimony, that he had no particular reason for not looking for a job in Florida, that he planned to look for a job, that he did not stop working because of his cognitive impairment, and that he told Dr. Resch that he read books, are substantial reasons to "discount" his testimony. Doc. 19, pp. 19-20.

Dr. Resch said that the books that Plaintiff read were suggestive of social immaturity. R. 256. Plaintiff said he stopped working because he moved, R. 177, but he left unsaid that Florida did not offer a sheltered job with his father. Plaintiff's statements that he planned to look for work fits with what his father and wife have said, that Plaintiff can superficially express himself well and always tries to place himself in a positive light, covering for his inability to comprehend.

But all of this puts the cart before the horse. The ALJ cannot properly determine whether Plaintiff's testimony is credible without first determining whether it is true that Plaintiff's psychological pattern is to put forth a superficially good front to mask his disability. That determination depends upon Dr. Resch, or another evaluating

psychologist, with the benefit of the lay opinion and Plaintiff's school and earlier IQ records, and a determination of the credibility of the lay opinion.

### Whether the ALJ erred in determining that Plaintiff's impairment does not meet or equal a Listed impairment

Plaintiff is correct that step 3 analysis must be reconsidered. Dr. Conger improperly found that Plaintiff had a significant work history, R. 274, and that is incorrect since Plaintiff had only sheltered work. That alone is a strong basis for finding that Dr. Conger's review is not substantial evidence in the record to support his conclusion that Plaintiff's condition does not meet Listing 12.02.

Second, the ALJ considered the earlier IQ scores and evaluations, and gave them little weight because they were "from over twenty years ago." R. 29. Dr. Resch, however, did not have those "school" records, and thought that it would be important to consider them. The ALJ's view of those earlier evaluations is incomplete without the opinion of Dr. Resch about the earlier evaluations. It may be true that Plaintiff's abilities have improved since childhood, and that his impairment does not meet or equal a Listed impairment, but Dr. Resch or another suitable psychologist should say so after review of those records. Since a remand is needed for these purposes, the remand will provide an opportunity to reconsider step 3 in light of the new evidence.

Finally, there is the issue of whether the ALJ erred at step 2 in not finding that Plaintiff had a "severe" impairment of a learning disability.[5] There is significant evidence

---

[5] "[I]n order for an impairment to be non-severe, 'it [must be] a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.' " Parker v. Bowen, 793 F.2d 1177, 1181 (11th Cir. 1986).

in this record that Plaintiff has a learning disability. On October 17, 1986, Dr. Belman

thought that Plaintiff had "a probable learning disability." R. 254. Dr. Lazar found that

Plaintiff was "severely learning disabled." R. 209. Dr. Kaye found that Plaintiff had

"information processing difficulties." R. 204. Dr. Rapport found that Plaintiff had

"specific learning disability." R. 213. Dr. Resch, however, found Plaintiff to be "capable

of learning," but she did not have the benefit of these earlier evaluations and she

thought that those records would be important. R. 257. Since a supplemental

psychological examination must be obtained, Dr. Resch or another psychologist should

also determine, based upon all of the evidence, whether Plaintiff has a learning

disability.

**Conclusion**

Considering the record as a whole, the findings of the Administrative Law Judge

were not based upon substantial evidence in the record and did not correctly followed

the law. The decision of the Commissioner to deny Plaintiff's application for benefits

should be reversed and remanded for further consideration as explained above.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to

deny Plaintiff's application for Social Security benefits be **REVERSED** and **REMANDED**

for a supplemental psychological evaluation by Dr. Resch or another psychologist, if she

is unavailable, with the benefit of the lay opinion and earlier evaluations, for a

determination of the credibility of the lay opinion after receiving the supplemental

opinion of Dr. Resch, for reconsideration at steps 2, 3, 4, and 5, and at step 5, for

additional vocational testimony.

**IN CHAMBERS** at Tallahassee, Florida, on March 18, 2010.

s/    William C. Sherrill, Jr.
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 14 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.